IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

GALILEO MONDOL, ALISON HINES, AND
MARK MONDOL,

                Plaintiffs,

v.                                          C.A. No. _____

CITY OF SOMERVILLE, JOSEPH CURTATONE,
ANTHONY PIERANTOZZI, AND GEORGE
SCARPELLI,

                Defendants.

## COMPLAINT FOR DAMAGES

1.      Plaintiff, Galileo Mondol ("Galileo"), a high school student who was wrongfully accused of committing serious sex offenses in connection with a school hazing incident, brings this action under 42 U.S.C. § 1983 to recover damages incurred by him as a result of city and school officials' conspiracy to violate his state and federal constitutional right to enjoy due process of law. This claim is based upon defendants' actions in knowingly controlling, influencing, manipulating and misleading those in charge of the criminal investigation and prosecution, knowingly making false accusations against Galileo to both law enforcement and to the media, and knowingly influencing, intimidating, and coercing child witnesses to make false statements against Galileo. Defendants took these actions under color of law so as to conceal and cover up the defendants' own responsibility for a hazing incident that occurred at a fall 2013 school soccer camp run by the defendants.

2.     In addition, Galileo and his parents bring state law claims for intentional torts including a Massachusetts Civil Rights Action, defamation, intentional infliction of emotional distress, and civil conspiracy based upon the same conduct.

## JURISDICTION AND VENUE

3.     This action arises under the Civil Rights Act, 42 U.S.C. § 1983, which provides a cause of action to redress the violation of rights protected by the Fourteenth Amendment to the Constitution.  This court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367.

4.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b)(1).

## PARTIES

5.     Plaintiff Galileo Mondol ("Galileo") is a high school student who resides in Cambridge, Massachusetts with his family.  In August 2013, he lived in Somerville, Massachusetts and had just turned 17 years old.

6.     Plaintiffs Alison Hines ("Ally") and Mark Mondol ("Mark") are Galileo's parents who reside in Cambridge, Massachusetts.

7.     Defendant City of Somerville is a municipal corporation of the Commonwealth of Massachusetts.

8.     Defendant Mayor Joseph Curtatone ("Curtatone") is and was at all relevant times Mayor of Somerville and Assistant Coach of the Somerville High School Boys' Football Team. He is sued in his official capacity and as an individual.

9.     Defendant Anthony Pierantozzi ("Pierantozzi") was at all relevant times the Superintendent of Somerville Public Schools. He is sued in his official capacity and as an individual.

2

10.     Defendant George Scarpelli ("Coach Scarpelli") is and was at all relevant times head coach of the Somerville High School Boys' Varsity Soccer Team. He is sued in his official capacity and as an individual.

## STATEMENT OF FACTS

11.     On August 30, 2013, then 17-year-old Galileo was arrested along with two 16-year-old students and charged with a number of offenses arising out of a hazing incident at a Somerville High School Fall 2013 Team-Building Camp ("Camp") held in Otis, Massachusetts. Galileo was charged with aggravated rape of a child under 16 by force, two counts of assault with intent to rape a child under 16, three counts of assault and battery by means of a dangerous weapon, indecent assault and battery on a person who has attained the age of 14, and three counts of witness intimidation.

12.     On April 24, 2015, twenty months later and three days before jury selection for his trial was to begin, the Commonwealth filed its Order for *Nolle Prosequi* dismissing all charges against Galileo.

## The Hazing Incident

13.     Galileo transferred to Somerville High School as a junior in the summer of 2013.

14.     Galileo had always been a good student, he had never had any disciplinary problems in school, and he had never been arrested.

15.     Galileo was an avid soccer player and he expected to play on the Somerville High School soccer team which, in 2012-13, was one of the top boys' soccer teams in the Commonwealth.

16.     On the weekend of August 23-26, 2013, all students hoping to play on the boys' and girls' varsity soccer teams or the boys' varsity football teams were required to attend a

3

weekend "team-building event" at a camp in the Western Massachusetts town of Otis. One hundred seventy students, including Galileo, attended. Sixty-one of those students were on the boys' freshman, junior varsity, and varsity soccer teams.

17.     Defendant Curtatone, who is a volunteer coach for the boys' football team, was one of the adult chaperones. Before the buses left Somerville Curtatone spoke to the students about hazing.

18.     Curtatone and the other coaches also distributed copies of an Anti-Hazing Pledge, which all attendees of the Camp were required to sign before they boarded the buses.

19.     On information and belief, defendants Curtatone, Pierantozzi, and Scarpelli knew that hazing and transgressive sexual behavior, including sexual assaults, had occurred in prior years at the Camp and they knew there was a high risk of such incidents reoccurring in 2013.

20.     Scarpelli assigned Galileo to stay in a three-room, junior/senior cabin with around 20 other boys. In Galileo's room ("Room 1") were two of the team's three co-captains and several other boys with whom Galileo had been friends since first grade. In the cabin's other two rooms ("Rooms 2 and 3") were approximately 15 boys, most of whom Galileo did not know. Among these boys were several 19-year-old seniors, a freshman who didn't speak English, and the younger brother of one of the team captains who was in elementary school.

21.     No chaperones were assigned to sleep in the cabins, nor did chaperones supervise any activities in the cabins. Students were permitted to visit other students' cabins during the daytime. The coaches and other chaperones slept in a separate cabin, which students were prohibited from entering.

22.     Galileo witnessed a number of disturbing incidents at the Camp. For example, groups of boys were crowding into the individual shower stalls while a single boy was showering

4

and they were touching him. Some boys were putting Icy-Hot cream on other boys' genitals. Some boys were playing a game they called "Mega Dick" which involved identifying which two boys had the largest genitalia and then taking cellphone pictures of their genitalia side by side.

23.     Galileo had never witnessed things like this while participating in club or private school soccer programs. All of the other Somerville High School boys in his cabin seemed to accept these activities as a normal part of the Camp, so Galileo did not discuss them with anyone.

24.     The soccer players referred to these activities as "pranks." One student mentioned that the same sorts of things had happened in the past and that, the year before, a prank had gone too far.

25.     Upon information and belief, there is a pattern and practice among some of Somerville's coaches and school officials of allowing transgressive sexual behavior among players to occur in the belief that it bonds the boys together as a team and makes them, in defendant Scarpelli's words, like "family."

26.     At 7:30 a.m. on Sunday, August 25, 2013, Scarpelli took the entire previous year's varsity squad and most of the coaches and chaperones to an off-site scrimmage against a local soccer team. Galileo and another junior, Gualter P. ("Gual")[1], were the only players left in the junior/senior cabin. There were approximately 17 junior varsity players left in the sophomore/junior cabin. Approximately ten freshmen were left at the Camp.

27.     Upon information and belief, there was only one adult, junior varsity coach John Tsirigotis ("Coach Tsirigotis"), at the Camp to chaperone the approximately 30 players who were spread out over three different buildings and the grounds.

---

[1]     With the exception of Galileo, pseudonyms or initials are used to protect the identity of individuals who were minors at the time of the incident.

28.     Sophomore Roberto P. ("Roberto") asked Gual and Galileo to go with him to the freshmen cabin.

29.     Gual and Roberto are both undocumented immigrants. Galileo had not met either boy before he joined the soccer team.

30.     Galileo arrived at the freshmen cabin after Gual and Roberto and he laid down on an empty bunk bed. Some of the boys were speaking in Portuguese and Spanish and Galileo understood very little of what they were saying. Most of the boys seemed to have known each other from before the camp.

31.     Gual began teasing the freshmen. He picked up a broom and pointed it at different freshmen saying "Who wants it? Who's going to get it?"

32.     Gual and Roberto began wrestling with freshman A.D. who was sitting on a bed. Gual was poking him in the legs and backside with the broom handle as if he were fencing. Everyone in the room was laughing.

33.     One of the freshmen, L.M., used his cellphone to take a video of the wrestling.

34.     Gual then tugged on freshman M.L.'s leg and told him to get down from the top bunk because he was either going to poke him with the broom or put Icy-Hot on his genitals.

35.     M.L. got down from the bunk and, smiling, immediately pulled down his own shorts and leaned slightly forward as if he were "mooning" Gual. Galileo thought that M.L. was doing this to be funny and to get attention. Everyone laughed. L.M. began video-recording with his cellphone again.

36.     Gual handed the broom to Roberto, who tapped M.L. with the tip of the broomstick near his tailbone. M.L. jumped forward as soon as the broom touched him. M.L. and all of the other freshmen were laughing.

37.     Galileo felt embarrassed and said, "What are you doing? There's no need to do that." Roberto tapped M.L. on his backside a second time with the tip of the broomstick and, again, M.L. moved forward. M.L. pulled up his shorts and returned to the upper bunk.

38.     The boys began speaking in Portuguese and Spanish. Gual asked M.L. to come down from the bunk again. M.L. did so and then he pulled down his own shorts without being asked to. M.L. wasn't laughing anymore. Galileo got off the bunk, walked over to Gual and whispered in his ear, "Don't do it. You're going to get in trouble. Think about what you're doing." Gual laughed and said out loud to the crowd, "Galileo says he'll lick the broom if I do it!" Some of the freshmen laughed. L.M. video recorded this exchange with his cellphone.

39.     Suddenly, Gual thrust the broom towards M.L.'s backside as he stood by the bunk. When Gual jabbed M.L. with the tip of the broom, M.L. immediately cried out and ran into the bathroom.

40.     Galileo was embarrassed and disgusted by what he had just witnessed. He left the freshman cabin and walked to the sophomore cabin.

41.     Gual and Roberto arrived at the sophomore cabin a few minutes later. Gual began telling the other soccer players what had just happened. Galileo became concerned that Gual might have injured M.L.

42.     Galileo returned to the freshmen cabin and asked M.L. if he was hurt. M.L. said "I think I'm good. I was bleeding, but it stopped."

43.     Galileo advised M.L. that he should tell an adult what happened if he was hurt.

44.     About 20 minutes later, the boys all attended soccer practice with Coach Tsirigotis. M.L. participated in the hour and a half-long practice without incident.

45.     When the varsity players returned from scrimmage just before lunchtime, Galileo
told two of the team co-captains what had happened. The co-captain then spoke to M.L. to make
sure that he was OK. None of the three co-captains, nor any of the other dozens of students who
had witnessed or heard about it, reported the incident to the coaches.

46.     However, when all of the soccer players and coaches were gathered around a
bonfire on the evening of the incident, M.L. attempted to inform defendant Scarpelli that he had
been the victim of hazing. Defendant Scarpelli asked each boy to say what the Camp had meant
to him. When M.L.'s turn came, he said it meant "pain, a lot of pain." Gual spoke up and asked
whether it was "good pain or bad pain." M.L. replied, "bad." Gual then said, "It must have been
good because you asked for it three times."

47.     Some students laughed. Defendant Scarpelli smiled, there was an awkward
pause, and then Scarpelli moved on to the next boy. Upon information and belief, Scarpelli
knew that the boys were referring to hazing and he made a decision not to inquire further.

### The Defendants' Cover-Up and Conspiracy to Frame Galileo

48.     On Tuesday, August 27, 2013, a Somerville High School English teacher and the
mother of one of the freshmen players (J.S.) reported to Coach Arias that her 10-year-old son had
told her that J.S. had told him that a boy at the camp "had a broomstick stuck up his bottom" by
Gual. Coach Arias informed defendant Scarpelli while he was with the team in the locker room.

49.     Scarpelli asked all students but the freshmen to leave the locker room. M.L. was
not at practice that day. Scarpelli asked J.S what had happened and J.S. told him that Gual,
Roberto, and Galileo had come into the freshmen cabin and that Gual had stuck a broomstick up
M.L.'s butt.

8

50.     Scarpelli asked the freshmen whether Roberto and Galileo had been helping Gual. They responded that only Gual had been involved in the assault. None of the boys reported any other misconduct or harassment.

51.     Scarpelli instructed the boys not to post anything about the incident on social media.

52.     Scarpelli then sent the freshmen home and he addressed the upperclassmen. He told them that "something bad had happened at camp" and that he would be suspending practices for the time being. He told them that if anyone spoke to a freshman about anything, he would be very upset. He then dismissed all of the players but for the three varsity co-captains. Scarpelli told the co-captains not to say anything, but the incident involved "hazing" and was being investigated.

53.     Scarpelli knew that the hazing incident would eventually be made public because J.S.'s mother was a public school teacher and, as such, she had a legal obligation to report a suspected assault on a child to the authorities.

54.     Coach Scarpelli realized that he had a serious legal and public relations problem on his hands, one that could negatively affect his employment, the promising 2013 soccer season, the political careers of himself and other adults who chaperoned at the Camp, and the reputation of the Somerville Public Schools.

55.     Instead of immediately reporting the hazing incident to the police, or calling the victim, M.L., to inquire about his condition, Scarpelli cancelled afternoon practices and convened an emergency meeting with school officials at Somerville High School ("Emergency Meeting") to discuss how they should respond to the hazing incident.

56.     Scarpelli met for approximately three hours with defendant Superintendent Pierantozzi, the Director of Student Services, Richard Melillo ("Melillo"), who worked in Pierantozzi's office and is responsible for school safety, Somerville High School Athletic Director, Nicole Viele ("Viele"), and high school Headmaster John Oteri ("Headmaster Oteri"). During the Emergency Meeting, defendant Curtatone was notified that a hazing incident had occurred at the Camp and, upon information and belief, he participated in the discussion about how to respond to the hazing incident.

57.     In August 2013, Curtatone was considering a run to be the Democratic nominee for Governor of Massachusetts. At the time, he had already spent hundreds of thousands of dollars of his own campaign funds, as well as public funds, promoting and polishing his reputation as a progressive leader throughout the greater-Boston area. His involvement in a sexual hazing scandal would likely have had disastrous consequences for his political ambitions.

58.     In the fall of 2013, Scarpelli was coaching a varsity team with a good chance of becoming state champions. He was aware that coaches involved in similar hazing incidents are routinely suspended or dismissed from their positions. In addition, Scarpelli had political ambitions. In August of 2013, he was serving as a member of the School Board in Medford, Massachusetts and, a year and a half later, he was running for a City Council seat in Medford. Coach Scarpelli recognized that his political ambitions, his employment, and his chance to coach a championship team would have been negatively affected if the public learned that a culture of hazing and sexually transgressive behavior existed at the Camp and that he and other chaperones had looked the other way.

59.     In August 2013, defendant Pierantozzi was trying to shore up the reputation of the Somerville Public Schools which had recently been damaged by publicity about Somerville

10

schools ranking in the bottom 5% on the Commonwealth's standardized test scores, and an ongoing and highly contentious bid to open a second public charter school within the city. Pierantozzi knew that his professional competence and the safety of Somerville's schools would be called into question if the public knew about the coaches' tolerance of hazing and other sexually transgressive behavior at the Camp.

60.     All three individual defendants recognized that the hazing incident at a school-sponsored camp exposed the City of Somerville to civil liability.

61.     At the Emergency Meeting and thereafter, the defendants conspired to conceal and cover up the hazing and other sexually transgressive behavior that had occurred at Camp because they understood that such conduct raised serious questions about their role in facilitating it and/or recklessly allowing it to occur.

62.     The defendants' strategy was (1) to falsely characterize what they knew to be a sports team hazing incident as a vicious, totally unexpected, isolated rape of a child by depraved individuals; (2) to silence any witnesses who might contradict their false characterization of the incident; and (3) to falsely accuse the transfer student, Galileo, of having participated in the rape and assaults.

63.     Defendant Scarpelli knew from the outset, based upon the freshmen witnesses' August 27th statements, that Galileo had *not* participated in the hazing incident. But he and the other defendants had several reasons for falsely implicating Galileo.

64.     Unlike Gual and Roberto who were still 16 years old at the time of the incident, Galileo had turned 17 a month before and was considered an adult for purposes of criminal responsibility. Therefore, unlike the juveniles, his name and photograph could be published in

11

the media and the defendants could portray him as "the face" of the vicious, isolated sex crime that they described.

65.     Secondly, as a recent transfer student, Galileo was an outsider at the Camp. This made it easier for the defendants to influence the child witnesses to make false statements against him, and to describe him in the press and to law enforcement as an unknown third party who had unexpectedly interjected violence into an unsuspecting sports camp.

66.     Thirdly, unlike the younger boys who witnessed the hazing, Galileo is from a well-known, politically active, educated, middle class family. The defendants knew it was unlikely that they would be able to silence him or pressure him into making false statements to police about what he had witnessed at the camp.

67.     Fourthly, Galileo was a convenient target because his mother, Ally, was a prominent member of a group that was applying to open a new public charter school in Somerville. This initiative had been aggressively opposed by Somerville officials, including defendants Curtatone and Pierantozzi. By accusing her son of being a child rapist, the defendants could both discredit the charter school initiative and end Ally's participation in it.

### Defendants' Implementation of their Conspiracy to Frame Galileo

68.     The Somerville Police Department opened a criminal investigation on August 27, 2013. The State Police joined the investigation the next day. Although no witnesses had implicated him, Galileo was immediately suspended from all school activities, including soccer practices.

69.     Despite knowing that a criminal investigation was underway, at 9:00 a.m. on Wednesday, August 28, 2013, Scarpelli and Pierantozzi's subordinates, Headmaster Oteri, Viele, Melillo and two high school guidance counselors met with the soccer players at Foss Park to

discuss the hazing incident ("Foss Park Meeting"). Law enforcement officers were not present at the Foss Park Meeting. Defendants were aware that none of the witnesses to the hazing incident had spoken to police prior to that meeting.

70.     Defendants' purpose in conducting the Foss Park Meeting was to influence, intimidate and coerce the child witnesses to make false accusations against Galileo, to describe the hazing incident in a false light, and to suppress statements about other transgressive sexual behavior that had occurred at the Camp in 2013 and before.

71.     Scarpelli informed the soccer players that police were investigating a serious crime that had occurred at the Camp. He said that the three upperclassmen who had been involved were banned from practices due to the investigation and that no one should communicate with them. All of the soccer players understood that Scarpelli was referring to Gual, Roberto, and Galileo.

72.     Scarpelli then told the boys that what had happened in the freshmen cabin was an isolated incident and that the suspended upperclassmen were the only ones who had been involved in any improper conduct at the Camp. He made it clear that he didn't expect to hear about any misconduct at the Camp other than that involving the three suspended upperclassmen. When he made this statement, Scarpelli knew or suspected that other sexual assaults had occurred at the camp and he intended to deter the child witnesses from reporting any additional assaults or sexual misconduct.

73.     Scarpelli then separated the freshmen players from the upperclassmen and he instructed them not to have any contact with each other until further notice. The upperclassmen met with the guidance counsellors and Scarpelli, Melillo, Oteri, and Viele met with the freshmen, including the eye-witnesses to the hazing incident.

13

74.     In addition to indicating to the freshmen witnesses that Galileo had been involved in the assaults on the freshmen, upon information and belief, Scarpelli also encouraged witnesses to make false accusations against Galileo.  Scarpelli later made statements to police that he knew to be false regarding what the freshmen witnesses had allegedly told him at the Foss Park Meeting about Galileo's involvement in the hazing incident.

75.     Scarpelli and Coach Arias spoke privately with A.D. at the Foss Park Meeting.

76.     Freshmen coach John Tsirigotis later explained in his statement to police that, at the Foss Park Meeting, "the story went from one perpetrator and one victim to three perpetrators and three victims."

77.     A few days after the Foss Park Meeting, Curtatone gave each member of the boys' soccer teams a $100 ticket to attend the Cavalia traveling horse circus that was in town.

78.     After the Foss Park Meeting, in addition to M.L., two freshmen, A.D. and J.S., now claimed that they were assaulted by Gual and Roberto.

79.     All three of the victims told police that Galileo was not involved in the assaults on them.

80.     Roberto insisted in his statement to police that Galileo had absolutely nothing to do with the assaults on the freshmen.  Gual did not mention Galileo having any role in his account of the incident.

81.     Three of the freshmen witnesses told police that Galileo had spoken up to try to stop the assault on M.L.

82.     Before the Foss Park Meeting, the freshmen eye-witnesses all described Galileo as a fellow witness to the assault, not a participant.  After the coaches and school officials told the freshmen that Galileo had been involved in the assaults, five of these child witnesses told

14

police that Galileo had participated verbally in one or more of the three alleged assaults. These false statements were induced and influenced by the defendants and their agents.

83.     After speaking privately with Scarpelli and Coach Arias, A.D., in his statement to police, described Galileo as participating physically in the assault on M.L. This false statement was induced and influenced by the defendants and their agents.

84.     The Somerville police seized the cellphone of L.M., the freshman who had video-recorded the hazing incident. The police recovered the video of M.L.'s injuries from the cellphone, but claimed that they were not able to recover the contemporaneous videos of the assaults themselves.

85.     On the afternoon of Friday, August 30, 2015, police appeared at Galileo's home without a warrant, handcuffed him, arrested him, and took him on a five-hour drive in Labor Day weekend traffic to a jail in Pittsfield, Massachusetts.

86.     Galileo, Roberto, and Gual were charged with committing five separate offenses, but were not charged with hazing, which is a felony in the Commonwealth.

87.     Galileo's attorney was not notified of his client's arrest. However, on information and belief, the defendants and/or agents under their direction *did* alert local television news stations which sent reporters to videotape Galileo being led, handcuffed, to a waiting police car. This footage, which plainly showed Galileo's face, was aired on the local evening news and, eventually, images of his arrest were shown all over the world. Radio, television and print media all reported that Galileo and two unnamed minors had been arrested for raping a child with a broomstick.

88.     Having already interfered with the criminal investigation and misled law enforcement, Curtatone and Pierantozzi launched their campaign to mislead the public by falsely characterizing what they knew to have been a sports team hazing incident as a brutal rape.

89.     Just an hour after Galileo's arrest, Curtatone and Pierantozzi issued a "joint statement" announcing the aggravated rape charges and claiming that a "thorough and meticulous investigation by the Berkshire County D.A.'s Office provides no indication that anyone other than the three individuals arrested have been implicated, and found that this was a single, isolated incident." At the time that they made this statement, defendants knew it to be false.

90.     In their statement, Curtatone and Pierantozzi thanked law enforcement authorities for "working cooperatively. . . with our school officials at every step of the investigation."

91.     Three hours after Galileo, Roberto, and Gual were arrested, Curtatone and Pierantozzi held a press conference at City Hall in which they announced that the three soccer players were facing charges that are "serious, disturbing, shocking and sad." Curtatone stated what he would repeat to the media in the coming week: "These allegations go far beyond hazing. This is rape."

92.     Curtatone at first denied that he was at the Camp at the time of the incident. He later admitted that he was a chaperone at the Camp when the incident occurred.

93.     WBZ News Radio aired tape of Pierantozzi falsely declaring that an adult had been with the students in every cabin overnight.

94.     Over the course of the next week, Mayor Curtatone gave a number of radio, television and print interviews about what he termed a "rape." In each interview, he stated that

16

there was no evidence of hazing at the Camp and that an isolated rape had occurred just "yards, if not feet away" from the chaperones who were diligently watching their charges.

95.    In response to the media's questions about what the district does to prevent bullying and hazing, Curtatone never mentioned that he himself had given the students a lecture on hazing and that he had overseen the players' signing of the school's Anti-Hazing Pledge.

96.    Based on the defendants' false and self-serving characterizations of the incident, the press reported that the three freshmen had been forced to their hands and knees and brutally raped with a broomstick by the three upperclassmen. Over the course of the next week, the story of the "broomstick rapist" was broadcast all over the world. Comments following the on-line stories contained disturbing threats of violence against Galileo, including that he should be tortured and killed.

97.    Galileo was locked up for a week in a protective custody cell where the lights were kept on 24 hours a day before he was finally released on $100,000 cash bail.

98.    On September 4, 2013, defendant Pierantozzi issued a press release stating that the City had committed $25,000 to fund a Student Travel Safety Committee that would investigate how the assaults at the sports camp could have occurred. Former Middlesex District Attorney and an old friend of Curtatone's, Gerry Leone, was to lead the committee.

99.    On September 9, 2013, an editorial in the Boston Globe was headlined "Ghastly rape charges also raise questions on hazing." The editorial called for an investigation of past hazing at the event and observed that, "one can imagine the sadistic acts that the prosecutors describe arising more easily when some pattern of hazing has previously been established."

100.     On September 10, 2013, in response to the Globe editorial, soccer team members were notified that they would be interviewed by law enforcement. Upon information and belief, those interviews never took place.

101.     A prominent Boston attorney who attempted to intercede on Galileo's behalf with the D.A.'s office in late September reported to Galileo's family that he was told that political pressure from Somerville was involved and that the prosecution was being driven by Somerville.

102.     In May 2014, the Student Travel Safety Committee that had been established by Pierantozzi issued its report. Although the public had been led to believe that the Committee would investigate how the assaults at the Camp had occurred, it turned out that the Committee was only tasked with reviewing current "protocols, procedures, policies and practices" for overnight student travel and fieldtrips. The Committee stated that its purpose was "NOT to discuss or assess the facts of any specific case." (emphasis in original)

103.     In discussing the Committee's recommendations at a school committee meeting, Pierantozzi explained that "[t]here is a 'know the student/child issue before taking a field trip' issue that we have not adhered to." He went on to say that, "if we take a field trip early [in the school year], we need to know a student better than they have been."

104.     Pierantozzi's comments were obviously referring to Galileo, and were reported by the *Somerville Journal* as such. Pierantozzi's comments were intended to defame Galileo by suggesting that he was primarily responsible for the attacks. Pierantozzi knew that his comments were false at the time he made them.

105.     None of the chaperones or coaches who were responsible for the safety of the children at the Camp have ever been investigated, disciplined, suspended, or fired.

18

106.    In May 2014, Scarpelli was given an honorary degree at the Somerville High School graduation for his admirable conduct in handling the Fall 2013 sexual assault scandal. He had been quoted in the *Somerville Journal* at the end of a very successful fall 2013 varsity season as saying that the team had used the sexual assaults "as a rallying point."

107.    Pierantozzi was rewarded for his part in deflecting the Camp scandal with effusive praise from the school committee and pay raises. Curtatone received a salary increase as well.

108.    While Somerville officials were benefitting from their own malfeasance, their decision to falsely characterize the Camp incident as an unforeseeable brutal rape, rather than as hazing, had terrible consequences for the three boys they targeted.

109.    Gual and Roberto each spent a year and a half out of school and under house arrest. In early 2015, they both entered the equivalent of guilty pleas in Juvenile Court to indecent assault and battery, and assault and battery with a deadly weapon. They were sentenced to commitment to juvenile detention facilities until the age of 21. They both faced the possibility of being listed on the sex offender registry and, as undocumented aliens, they will likely be deported to their native countries, Brazil and El Salvador respectively.

110.    Neither Gual nor Roberto was asked to plead guilty to the aggravated rape charge that had garnered so much attention. The prosecution's own medical expert had determined that there was inconclusive evidence of penetration and, therefore, the assault on M.L. was not a rape after all.

111.    For the 20 months during which his criminal case was pending, Galileo was facing a possible sentence of life in prison if convicted. If he had received less than a life sentence, he faced having to spend the rest of his life as a registered sex offender.

112.    While his case was pending, Galileo was advised by his probation officer and several attorneys that he should not go out in public alone because of the risk that he could be attacked by members of the public who had been led to believe that he had forcibly raped a child.

113.    Until August 2015, Galileo was unable to find any schools, public or private, that would allow him to attend classes. He spent two entire years out of school and watched from the sidelines as his former classmates graduated high school and left for college.

114.    While charges were pending, Galileo's passport was seized and he was prohibited from traveling outside the U.S. Consequently, he was unable to attend his grandfather's memorial service in the U.K;

115.    While charges were pending, Galileo's liberty was seriously restricted. He was subject to arrest and incarceration pending trial if he were found outside of his home without his parents after 11:00 p.m. or if he were found on any property owned by the Somerville Public Schools. He was unable to attend his younger brother's soccer games and social gatherings that did not have limited guest lists.

116.    While his charges were pending, Galileo was forced to borrow $200,000 to pay his criminal defense attorneys, educational tutors, and other expenses.

117.    On April 24, 2015, the Commonwealth dropped all criminal charges against Galileo but his life has not returned to normal.

118.    Galileo's good name and reputation have been utterly and permanently destroyed. At present, when one conducts a Google search using his name, it retrieves thousands of hits describing Galileo as an accused child rapist. Galileo has spent two and a half years as a social outcast and, even though the criminal charges have been dismissed, he continues to be treated as a pariah. He has stopped going to parties outside of a narrow circle of friends because guests

often identified him as the broomstick rapist. Many people in the community have shunned him and his family ever since he was falsely accused of raping a child.

119.    Galileo's ability to find paid employment has been limited to working for family friends.

120.    Galileo has been unable to find a school, city or club soccer team that will allow him to play or to continue to referee games.

121.    In the hope of avoiding further discrimination and retaliation from Somerville officials, Galileo and his family have been forced to move from their home in Somerville, in which Galileo was born and raised and in which his parents had lived for 23 years, to a rented house in Cambridge.   Nevertheless, Galileo is facing discrimination because of defendants' actions as he strives to complete his high school education at a Cambridge public school.

122.    Galileo and his parents have suffered and continue to suffer severe anxiety, stress, and depression, which have been evidenced by both physical and psychological symptoms, from the time when Galileo was arrested, while his criminal case was pending, and in the aftermath of these events.

## COUNT I
**Conspiracy to violate and violation of rights protected by the Due Process Clause
of the Fourteenth Amendment to the United States Constitution
(Galileo v. All Defendants)**

123.    Galileo restates and realleges, as if fully set forth herein, every allegation contained above.

124.    Defendants, acting under color of law, intentionally and willfully conspired amongst themselves to deprive Galileo of rights secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and did in fact deprive him of those rights, in that they:

21

a. Intentionally and maliciously controlled, influenced, manipulated and misled those in charge of the criminal investigation and prosecution of Galileo so as to have criminal charges that they knew to be baseless brought against him;

b. Intentionally and maliciously tampered with, influenced, coerced, and intimidated child witnesses so as to facilitate the filing of false criminal charges against Galileo;

c. Made false statements to law enforcement so as to facilitate the filing of criminal charges against Galileo; and

d. Intentionally and maliciously made false statements to the public and to law enforcement officials so as to deprive Galileo of his liberty interest in his reputation to the point where he was put in danger of being assaulted by others, and then defendants deprived Galileo of his property interest in the right to a public education on that basis.

125.    These unconstitutional actions were taken pursuant to policies adopted by the individual defendants who had final policy-making authority in the areas in which they acted. Defendants' actions have deprived Galileo of rights protected by the Fourteenth Amendment, including his liberty and property, and have cost him in excess of $1,000,000 in legal fees and costs, lost wages, costs for private educational services, interest, and other associated costs.

## COUNT II
### Massachusetts Civil Rights Action
**(Galileo vs. Curtatone, Pierantozzi, and Scarpelli in their individual capacities)**

126.    Galileo restates and realleges, as if fully set forth herein, every allegation contained above.

22

127. Defendants interfered with and/or attempted to interfere with Galileo's rights secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and Article X of the Massachusetts Declaration of Rights to be free from unlawful arrest, the deprivation of liberty and property without due process, and the unlawful deprivation of a free public school education.

128. Defendants' interference with Galileo's secured rights was accomplished by threats, intimidation, and/or coercion against third parties, namely the child witnesses to the hazing, whose tainted statements to law enforcement then led to the filing of false criminal charges against Galileo.

129. Defendants' actions have deprived Galileo of rights protected by the Fourteenth Amendment, Article X of the Massachusetts Declaration of Rights, and Part II, Chapter 5, § 2 of the Massachusetts Constitution, and have cost him in excess of $1,000,000 in legal fees, lost wages, costs for private educational services, interest, and associated costs.

## COUNT III
### Defamation
### (Galileo vs. Curtatone, Pierantozzi, and Scarpelli in their individual capacities)

130. Galileo restates and realleges, as if fully set forth herein, every allegation contained above.

131. The aforementioned statements and publications by defendants were false and defamatory *per se*.

132. The aforementioned statements and publications by defendants were about and concerned Galileo.

133. Defendants made and published the defamatory statements about Galileo with malice and a reckless disregard for whether they were false and untrue.

23

134. The aforementioned statements and publications by defendants were published and made to third parties.

135. The aforementioned statements and publications by defendants have severely and permanently damaged Galileo reputation, earning potential, educational options, and relations with others.

## COUNT IV
### Intentional Infliction of Emotional Distress
**(All Plaintiffs vs. Curtatone, Pierantozzi, and Scarpelli in their individual capacities)**

136. The plaintiffs restate and reallege as if fully set forth herein, every allegation contained above.

137. By their conduct described above, defendants intended to inflict emotional distress upon the plaintiffs or were recklessly indifferent to the fact that emotional distress was likely to result from their conduct.

138. Defendants engaged in conduct that was extreme and outrageous.

139. Defendants' conduct caused severe emotional distress to Galileo and his mother and father.

## COUNT V
### Civil Conspiracy
**(Galileo vs. Curtatone, Pierantozzi, and Scarpelli in their individual capacities)**

140. Galileo restates and realleges as if fully set forth herein, every allegation contained above.

141. The aforementioned tortious conduct was committed by defendants in concert and pursuant to a joint scheme to damage Galileo.

142. Defendants provided substantial assistance to each other in order to accomplish their scheme to damage Galileo.

143.   Defendants pursued their joint scheme knowing the others' conduct was tortious and injurious to Galileo.

WHEREFORE, Galileo Mondol, Alison Hines, and Mark Mondol request judgment in their favor and against defendants, jointly and severally, on the averred counts as follows:

1.   Compensatory damages in excess of $1,000,000 as determined at trial;

2.   Punitive damages in an amount to be determined at trial;

3.   Costs and attorneys' fees; and

4.   Such other and further relief as the Court deems right and just.

**PLAINTIFFS DEMAND A JURY ON ALL ISSUES TRIABLE**

Dated: October 30, 2015

Donna M. Brewer, Esquire, BBO# 545254
Miyares and Harrington LLP
40 Grove Street, Suite 190
Wellesley, MA 02482
(617) 489-1600
(617) 489-1630 (fax)
dbrewer@miyares-harrington.com

Attorney for Plaintiffs Galileo Mondol,
Alison Hines and Mark Mondol

25