UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| GALILEO MONDOL, ALISON HINES, and MARK MONDOL, | * * * | |
| | * | |
| Plaintiffs, | * * | |
| | * | |
| v. | * * | Civil Action No. 15-cv-13697-ADB |
| | * | |
| CITY OF SOMERVILLE, JOSEPH CURTATONE, ANTHONY PIERANTOZZI, and GEORGE SCARPELLI, | * * * * | |
| | * | |
| Defendants. | * * | |

## MEMORANDUM AND ORDER
## GRANTING MOTION FOR SUMMARY JUDGMENT

BURROUGHS, D.J.

Plaintiffs Galileo Mondol and his parents, Alison Hines and Mark Mondol, allege that

Defendants, all associated with Somerville High School, conspired to violate the constitutional

rights of Galileo Mondol, a high school soccer player who faced charges, later dropped, in

connection with a sexual assault at a sports camp in 2013. Plaintiffs also bring various state law

claims. Defendants seek summary judgment on all claims, and also seek reimbursement for costs

and attorneys' fees. For the following reasons, Defendants' motion for summary judgment is

<u>GRANTED</u> and the motion for fees is <u>DENIED</u> without prejudice.

## I.    BACKGROUND

At summary judgment, the Court must view the facts in the light most favorable to the

nonmoving party, drawing all reasonable inferences in that party's favor but disregarding any

"conclusory allegations, improbable inferences, and unsupported speculation." <u>McGrath v.

Tavares</u>, 757 F.3d 20, 25 (1st Cir. 2014). Accordingly, the summary of material facts that

follows is drawn from Plaintiffs' statement of facts and those portions of Plaintiffs' response to Defendants' facts ("Pl. Facts") [ECF No. 106] that indicate the lack of a genuine dispute.[1] Additional facts are reserved for later discussion.

### A. The Parties

In August 2013, when the events at issue took place, Plaintiff Galileo Mondol was 17 years old and lived with his family, including his parents, Plaintiffs Alison Hines and Mark Mondol, in Somerville, Massachusetts. Pl. Facts ¶ 76. At the time, Galileo, an avid soccer player, had just transferred to Somerville High School as a junior and hoped to play on the Somerville High School soccer team. Id.

Defendant George Scarpelli was the head coach of the Somerville High School boys' varsity soccer team. Id. ¶ 81. Defendant Anthony Pierantozzi was the superintendent of Somerville Public Schools. Id. ¶ 80. Somerville Mayor Joseph Curtatone is also named as a defendant, in his role as an assistant coach for the Somerville High School boys' football team, as is the City of Somerville, a municipal corporation in the Commonwealth of Massachusetts. Id. ¶¶ 78–79.

### B. Team-Building Camp

Somerville High School regularly conducted annual team-building camps for student-athletes in late August. Id. ¶ 82. From 2011 to 2013, Scarpelli and Curtatone were the principal organizers of the camps, which took place at Camp Lenox in Otis, Massachusetts. Id. ¶¶ 1, 82–

---

[1] Because the ensuing sections focus on only those facts that are material to Plaintiffs' claims against the named Defendants, certain details from Plaintiffs' extensive statement of facts are dealt with summarily or not referenced herein. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

83. As superintendent, Pierantozzi was responsible for reviewing and approving plans for the camps. Id. ¶ 85. In 2013, all students trying out for the Somerville High School boys' varsity soccer team were required to attend the team-building camp from August 23 to 26. Id. ¶ 90. Galileo was one of 61 soccer players present. Id. ¶ 91.

According to members of the boys' soccer team who attended the camp, numerous incidents of hazing and sexually transgressive behavior occurred among team members during the 2013 camp, including students being sexually assaulted in the showers, bathrooms, or while they were sleeping, and students having Icy-Hot cream put on their genitals while they were being pinned down by other players. Id. ¶¶ 102–06. Much of this same conduct had allegedly also occurred at camps in 2011 and 2012. See id. ¶¶ 87–88, 101. Galileo, a transfer student and new to the camp environment, found this sexual behavior "weird" and "scary," and was worried that someone might attack him. Id. ¶ 107.

### C.    The Incident[2]

On the morning of August 25, Scarpelli left the camp with the previous season's varsity squad to participate in a scrimmage game against a local soccer team. Id. ¶ 108. Galileo and another junior, Gual,[3] were the only players left in the junior-senior cabin. Id. ¶ 109. Shortly after breakfast, a sophomore named Roberto joined Galileo and Gual in the junior-senior cabin. Id. ¶ 112. Galileo had not met either boy before joining the soccer team. Id.

Gual proposed that the three boys go to the freshman cabin, but no one said anything

---

[2] The eyewitness reports of the incident in the summary judgment record vary greatly regarding the role and perspective of the persons involved. In accord with the summary judgment standard, this section incorporates Plaintiffs' version of events, reasonable inferences drawn from it, and other non-disputed information.

[3] This memorandum adopts the naming conventions from Plaintiffs' statement of facts to protect the identities of individuals who were minors at the time of the incident.

about bothering or harming any freshmen. Id. ¶ 113. Roberto and Gual walked over, and Galileo joined them a few minutes later. Id. ¶ 114. When Galileo arrived, the other players were making small talk with each other. Id. ¶ 115. Galileo laid down on an empty bunk bed. Id. Thereafter, Gual picked up a broom that was leaning against a wall and began to point it at different freshmen, saying, "Who wants it? Who's going to get it?" Id. ¶ 116. He first pointed the broom at freshman A.D., who was on one of the bunk beds, and said, "How about you?" Id. ¶ 117. Gual began poking A.D. with the broom, but A.D. batted it away with his hands. Id.

Gual then turned his attention to freshman M.L., who was on a top bunk, and said, "What are you laughing at, Ugly?" Id. ¶ 118. Gual handed the broom to Roberto and began trying to persuade M.L. to come down from the top bunk. Id. ¶ 119. Gual told M.L., "It's this or the Icy-Hot. Trust me. The Icy-Hot happened to me twice. It's not fun. You'd prefer this to the Icy-Hot." Id. M.L. continued to resist, but after about two minutes, he got down from the bunk bed, pulled down his shorts, and leaned over. Id. ¶¶ 119–20. When Roberto, who was still holding the broom, tapped M.L. on the butt with the tip of the broomstick, M.L. jumped forward and some of the players in the room laughed. Id. ¶ 120. M.L. then pulled up his shorts. Id.

Gual immediately began pressuring M.L. to "do it again," saying, "Come on, bro . . . That didn't count . . . Stop being a pussy." Id. ¶ 121. After about a minute, M.L. pulled his shorts back down. Id. As Roberto moved to tap M.L. again with the broomstick, Gual said to everyone, "Look at this," which appeared to make M.L. even more uncomfortable. Id. ¶ 122. Upon observing this, Galileo said, "Why are you doing this? Stop being idiots. There's no need. Don't do this." Id. When Roberto tapped M.L. on the butt a second time, M.L. again jumped forward and then climbed back up onto the bunk bed while the other players laughed. Id. Gual told M.L. to come back down from the bunk and that Roberto's taps with the broomstick "didn't count."

Id. ¶ 123. M.L. relented, although it was clear that he was uncomfortable. Id. Gual took the broomstick from Roberto. Id. At this point, Galileo got off the bed, approached Gual, and whispered in his ear, "Stop, bro. You're going to get into trouble. This is a bad idea and M.L. doesn't want this. Don't do this. You're being an idiot." Id. ¶ 124. Gual smiled and said out loud, "Galileo says he'll lick the broom if you let me do it again." Id. Galileo also smiled and shook his head, indicating he would not do so. Id.

After coming down from the top bunk, M.L. pulled down his shorts and leaned forward. Then Gual quickly poked M.L. near the anus, causing a bruise and an external laceration. Id. ¶ 125. M.L. screamed and ran to the bathroom where he discovered that he was bleeding. Id. Everyone, including Gual, was shocked when they saw that M.L. was injured, and they offered to help him. Id. ¶ 126. After making sure that M.L. was not in immediate danger, Galileo left the cabin. Id.

### D.     The Rest of the Camp

After about 15 minutes, Galileo returned to the freshman cabin to check on M.L. Id. ¶ 127. Galileo said, "I'm really sorry. Gual shouldn't have done that. That's really stupid." Id. M.L. asked Galileo to check his injury to see how bad it was. Id. Galileo said it looked O.K., but that he should tell someone if he was hurt. Id. He also offered to get M.L. some ice or ointment from the medical kit. Id. Approximately 20 minutes later, M.L. participated in a 90-minute soccer practice without incident. Id. ¶ 128.

Just before lunch, when the varsity players returned from the scrimmage, Galileo told two of the team's co-captains about the incident, although both of them already knew about it. Id. ¶ 129. One of the co-captains went to check on M.L. while the team was at lunch and reported back that M.L. was fine and that there was no need to tell the coaches. Id.

That night, all of the soccer players and coaches gathered at a bonfire. Id. ¶ 130. Still, no one had told the coaches anything about the incident. See id. ¶ 129. At the bonfire, Scarpelli asked each freshman to say what the camp had meant to him. Id. ¶ 130. When M.L.'s turn came, he said, "Pain, a lot of pain." Id. Gual interjected, asking whether it was "good pain or bad pain." Id. M.L. said, "Bad." Id. Gual replied, "It must have been good because you asked for it three times." Id. Some students laughed, and an awkward pause followed. Id. Scarpelli moved on to the next player. Id.

Throughout the rest of the camp, M.L. did not report the incident because he was embarrassed and afraid he would get into trouble. Id. ¶ 131. Gual, however, bragged about the "prank" to other players. Id. ¶ 132. Galileo checked on M.L. multiple times to see if he was okay Id.

**E.     First Reports to Scarpelli and Other Coaches**

The attack was first reported to the coaches on August 27, one day after the players returned from the camp. Id. ¶ 133. Between 10:15 a.m. and 1:30 p.m., the mother of freshman eyewitness J.S. told volunteer coach Tony Osoy-Arias that she had heard about the incident from J.S.'s younger brother. Id. ¶ 134.

At approximately 1:45 p.m., Osoy-Arias reported this information to Scarpelli, who was with the team in the locker room. Id. ¶ 134–35. Scarpelli told the players that they had "made a really big mistake" and that there was going to be a lot of attention on Somerville High School. Id. ¶ 136. Scarpelli then kicked everyone out of the locker room except for the freshmen. Id. ¶ 137. Along with the other coaches, Scarpelli questioned the players about the incident for approximately 10 to 15 minutes. Id. At least two freshmen reported what Gual had done, and "someone" mentioned that Galileo and Roberto had been in the freshman cabin as well. Id. ¶¶

138–39. According to a statement later made to the police by Osoy-Arias, "[t]he coaches got the impression that Galileo and Roberto 'were not helping but watching and not doing anything to stop it.'" Id. ¶ 139. Neither M.L. nor A.D. were present at this locker room meeting. Id. ¶ 137.

After sending most of the players home, Scarpelli and two coaches met with the team's three co-captains about the incident. Id. ¶ 144. When he learned that all three co-captains had known about the assault but failed to report it, Scarpelli placed his hands on either side of his face and said, "We're so fucked." Id. Scarpelli never tried to question Galileo or Roberto about the incident, although both were at practice that day. Id. ¶ 143.

## F. Emergency Meetings

Between 2:30 and 8:30 p.m. on August 27, Defendants participated in a series of emergency meetings regarding their response to the incident. Id. ¶ 157. Although these meetings involved numerous other school district and city officials, as well as members of law enforcement, id. ¶ 158, the following summary focuses on the conduct of the named Defendants.

Pierantozzi first learned of the incident sometime in the afternoon of August 27. Id. ¶ 159. As he understood it at the time, the attack involved a freshman victim, M.L., and a single assailant, Gual. Id. Pierantozzi discussed the incident with the Somerville Police chief and other members of the department, who used the terms "aggravated sexual assault" or "aggravated rape" to describe what had happened. Id. ¶ 161.

That same afternoon Curtatone learned of the incident from both Pierantozzi and Scarpelli. Id. ¶¶ 162, 165. After meeting with Scarpelli about the attack, "Curtatone understood that the freshman victim of the assault may have been anally raped with a broomstick by some upperclassmen." Id. ¶ 165.

Pierantozzi and Scarpelli also participated in a subsequent meeting around 3:30 p.m. that

involved several other coaches and school officials. Id. ¶ 167. The reports at that meeting were "jumbled" and inconsistent, but the coaches conveyed that Gual was the primary aggressor. Id. ¶ 169. Although Galileo was mentioned as having been present in the cabin, none of the coaches provided any specific information to suggest that Galileo had been directly involved in the assault. Id. ¶ 172. During this meeting, Pierantozzi again spoke by telephone with police officials, who said that charges of "joint venture" and "aggravated rape of a child" could be filed against Galileo, Roberto, and Gual. Id. ¶ 175. Pierantozzi decided that if the police found widespread participation, the soccer season would have to be cancelled, but that if the misconduct was limited to the three named upperclassmen, the season could go forward. Id. ¶ 177. The Defendants agreed to meet the following morning at Foss Park to discuss the assault with the players, including the freshmen eyewitnesses. Id. ¶ 178.

Meanwhile, Pierantozzi and the Somerville High School headmaster determined that all three of the upperclassmen who had been present during the assault—Gual, Roberto, and Galileo—should be suspended from school and the soccer team. Id. ¶ 176. By 6:40 p.m., Galileo's father had been informed of the suspension by phone and was told it was the result of Galileo being "named in a criminal investigation." Id.

### G. Police Investigation Opened

At approximately 5:30 p.m. the same day, August 27, Somerville Police Det. Kathryn Costa-McDade arrived at the high school to take a report from coaches and school officials as part of a criminal investigation. Id. ¶ 182. School officials, including Pierantozzi, told the detective that "three upperclassmen had entered the freshmen cabin at the camp and had anally raped a freshman with a broomstick." Id. ¶ 183. They provided Det. Costa-McDade with the names and contact information of M.L., Gual, Roberto, Galileo, and the mother who initially

reported the assault, but they did not provide "any information about how Galileo had allegedly been involved in the assault." Id. ¶¶ 184–85. Det. Costa-McDade told the school officials not to ask any more questions of the witnesses because the incident was now under criminal investigation. Id. ¶ 187. She understood that the coaches would continue to hold soccer practices and would "make reference" to the incident, but that they would not gather information. Id. ¶ 188.

At approximately 6:42 p.m., concerned that M.L. might need medical attention, Det. Costa-McDade and Osoy-Arias arrived at M.L.'s home, but no one was there. Id. ¶ 190. Shortly thereafter, Det. Costa-McDade interviewed the mother who had initially reported the assault. Id. ¶ 191. The mother could not remember whether or not her son had initially told her that Galileo and Roberto were in the freshman cabin at the time of the assault. Id. Later that evening, at approximately 8:48 p.m., Det. Costa-McDade, Osoy-Arias, and a Spanish translator from the police department returned to M.L.'s home and told his parents about what happened. Id. ¶¶ 192–93. M.L. listened as his coach and the police told his parents that "some other students" had anally raped him with a broomstick. Id. ¶ 193. At approximately 10 p.m., Det. Costa-McDade spoke with a State Police trooper who was assigned to the Berkshire County District Attorney's Office and would become the lead investigator on the case. Id. ¶ 195. The detective relayed "some initial details of the assault," including the names of Gual, Roberto, and Galileo. Id.

## H.      Foss Park Meeting—Morning, August 28, 2013

The next morning, a group that included Curtatone and Pierantozzi met at the mayor's office. Id. ¶ 196. There, Defendants "planned what they were going to do and say when they met with the witnesses later that morning at Foss Park" and at a subsequent meeting at the library that night. Id. Plaintiffs' statement of facts provides no further clarity regarding the specifics of those

plans. Later, at approximately 9 a.m. that morning, Scarpelli, Pierantozzi, and others met with the soccer players at Foss Park to discuss the incident, which the adults variously described as "hazing," "assault," and "rape." Id. ¶¶ 197, 200.

The players, who thought they were reporting for a practice, were surprised by the meeting with school officials, and took the meeting and the presence of the school officials to mean that there was a problem. Id. ¶ 198. By this time, at least some of the players were aware that Gual, Roberto, and Galileo had been suspended from school and from the team, and believed that it had to do with the assault, id. ¶¶ 198–99, but as Defendants knew, none of the witnesses to the assault had yet been formally interviewed by the police. Id. ¶ 197.

During this meeting, the coaches and school officials gave information to the players, including: that the hazing incident had involved multiple upperclassmen and a freshman, id. ¶ 201; that the upperclassmen had hurt a freshman so badly that he had to see a doctor, id. ¶ 202; that the police were investigating the incident, id. ¶ 203; that the three upperclassmen who had been involved in the incident had been suspended from the team due to the investigation, id. ¶ 204; that no one should communicate with Gual, Roberto, or Galileo because they were part of the investigation, id. ¶ 205; that the 2013 soccer season was at risk because of the incident, id. ¶ 206; that "the boys who did this" would face serious consequences, id. ¶ 210; that the school would make people available to the players if they needed someone to talk to, id. ¶ 212; that the players should "stay strong as a team" and "[s]tick together," id. ¶¶ 214–15; and that the players should not speak with the media or use social media, id. ¶¶ 217–18.

Scarpelli then separated the freshmen from the upperclassmen. Id. ¶ 219. He told the freshmen that if they knew anything else about what had happened in the freshman cabin, they should speak up. Id. ¶ 221. Eventually, freshman A.D. came forward and reported that Gual and

Roberto had attacked him and tried to poke him with the broom. Id. ¶¶ 222–24. After he

implicated Gaul and Roberto, Scarpelli and Osoy-Arias hugged A.D. in front of the other

witnesses. Id. ¶ 227. After A.D. spoke up, freshman J.S. said that Gual had tried to assault him

too, but he didn't feel like a victim because Gual's behavior hadn't bothered him. Id. ¶ 225. No

one at the Foss Park meeting accused Galileo of having been involved in any wrongdoing in

connection with the alleged assaults in the freshman cabin. Id. ¶ 226. The players were told that

there would be a mandatory meeting that night for them and their parents at the Somerville High

School Library. Id. ¶ 231.

### I. City Hall Meeting—Mid-morning, August 28, 2013

Immediately following the Foss Park meeting, between 10:30 a.m. and 12:15 p.m.,

Pierantozzi, Scarpelli, Curtatone, and others met at City Hall to develop a public relations

strategy for dealing with the incident. Id. ¶ 237. At this meeting, Defendants prepared for the

meeting scheduled for that night at the library and decided to meet with the players the following

day to "gain some trust." Id. ¶ 238. Also, a false accusation about Galileo being involved in the

alleged attack on A.D. was mentioned, but Plaintiffs' statement of facts does not specify by

whom. Id. ¶ 239.

### J. Library Meeting—Evening, August 28, 2013

That night, between 7:45 and 9:10 p.m., Defendants and others hosted a mandatory

meeting for soccer players and their parents at the Somerville High School Library. Id. ¶ 246. At

the meeting, Curtatone said that police were investigating a hazing incident that had occurred at

the camp three days earlier, id. ¶ 248, and that three victims had been identified, meaning that he

considered M.L., A.D., and J.S. all to be victims, id. ¶ 253. Curtatone also offered free tickets to

the Cavalia Horse Circus to the families of the soccer players. Id. ¶ 260. Players understood that

the tickets were "not cheap," but Plaintiffs' statement of facts provides no explanation for why Curtatone offered these tickets. Id. Plaintiffs' statement of facts attributes additional statements to unnamed "city officials" or "Somerville officials," but does not specify whether any of the named Defendants were the officials who made those statements. See id. ¶¶ 249, 251–52, 255–57, 259.

Shortly after the library meeting, Scarpelli and Osoy-Arias spoke with victim A.D. and his father. Id. ¶ 261. Scarpelli apologized to A.D.'s father and said they should go to the Somerville Police Department to speak with an officer about the incident. Id. ¶¶ 261–62. Further, Scarpelli, Curtatone, and Pierantozzi spoke with M.L. and his family. Id. ¶ 264. Curtatone offered support to M.L. and his family, and advised them also to go to the Somerville Police station to be interviewed. Id. ¶¶ 266–67.

**K.      Police Investigation and Arrests**

After the Foss Park meeting, Defendants told Det. Costa-McDade that A.D. had come forward as an additional victim, but did not mention the report by J.S. Id. ¶ 233. According to Plaintiffs, however, Defendants falsely reported to the detective that A.D. had said that Galileo held him down while Gual tried to poke him with the broom. Id. Det. Costa-McDade immediately relayed this erroneous information to the State Police personnel in charge of the investigation, and it was also communicated to the assistant district attorney assigned to the case. Id. ¶¶ 234, 236. The State Police case initiation report describing the investigator's conversation with Det. Costa-McDade identified Gual, Roberto, and Galileo as the upperclassmen involved in the incident and noted that the investigator was "[n]ot sure who [was] the ringleader." Id. ¶ 234. At some point on August 28, Scarpelli also spoke with a different State Police trooper, but Plaintiffs' statement of facts includes no detail about what was said. Id. ¶ 235. Further, according

to Plaintiffs, certain unidentified "school officials" told the assistant district attorney, falsely, that Galileo had previously been expelled from two private schools and that he came from a family with significant financial resources. Id. ¶ 236.

Later that night and into the following day, police interviewed all three alleged victims and various witnesses. Id. ¶¶ 271–94. According to a search warrant affidavit, which Plaintiffs assert is identical in relevant part to the warrant for Galileo's arrest, id. ¶ 275 n.3, the victims and witnesses made various statements to police about Galileo's alleged involvement in the incident. M.L. stated that Galileo joined Gual and Roberto in saying, "You guys are going to get it today," as they entered the freshman cabin, and that Galileo had assaulted A.D. Id. ¶ 277. A.D. said that Galileo had raped and cut M.L. with the broomstick, id. ¶ 280, and J.S. told police that Galileo had encouraged Gual to assault M.L. by agreeing to "lick the broom" if Gual did it one more time, id. ¶ 274. Finally, witness L.M. stated that "the three men" sexually assaulted A.D., hit J.S. with a broomstick, and then turned to M.L. before Gual sexually assaulted M.L. with the broom.[4] Id. ¶ 282.

Plaintiffs' statement of facts contrasts these allegations with other instances where many of these same witnesses either stated that Galileo was not involved in the attacks or did not identify him as a perpetrator. For instance, M.L. told police on August 28 that Galileo had not been involved in the attack on him, but rather tried to stop the assault by warning Gual that he would get in trouble. Id. ¶ 276. On the same day, A.D. told police that Galileo was not in the room when Gual and Roberto attacked him. Id. ¶ 279. In statements to the police, also on August 28, J.S. never described Galileo as being involved in the "horsing around" with him, id. ¶ 273,

---

[4] Witness L.M. told police that he used his cell phone to record videos of the incident and of M.L.'s injury, but police were unable to recover these videos. Pl. Facts ¶ 290.

and eyewitness J.H. similarly did not implicate Galileo in the attack. Id. ¶ 285. On August 29, eyewitness R.D.R. told police that Galileo had no involvement in the incident. Id. ¶ 284. Finally, Gual and Roberto both told police on August 29 that Galileo did not plan, participate in, or discourage the reporting of any crimes that occurred during the incident. Id. ¶¶ 286–87.

In general, Plaintiffs assert that the statements indicating Galileo's lack of involvement are true, but that those accusing him of wrongdoing are false and the result of Defendants' "repeated claims that Galileo had participated" in the attack. Id. ¶¶ 274, 277, 280, 282. Late on August 29, Curtatone learned that prosecutors planned to charge Gual, Roberto, and Galileo with rape and other offenses, and that Galileo would be charged as an adult. Id. ¶ 295. Upon learning of the impending charges (and, presumably, arrests), Curtatone scheduled a meeting at his office the next morning to discuss a public relations response. Id. ¶ 297. While several other city and school officials, including Pierantozzi, attended this meeting with Curtatone, Scarpelli did not attend, although he too was informed that the three players would be arrested before it happened. Id. ¶¶ 297–98.

Plaintiffs further claim that Defendants, or their agents, alerted a local television news station about the impending arrests. Id. ¶ 307. As a result, the station obtained video footage of Galileo being led handcuffed to a waiting police car, and, according to Plaintiffs, this footage was broadcast "all over the world." Id. ¶¶ 307–08. Curtatone was aware that, of the three arrestees, only Galileo would be publicly identified, since he was the only one charged as an adult, while Gual and Roberto were charged as juveniles. Id. ¶¶ 295, 320.

## M.    Charges and Prosecution

Gual, Roberto, and Galileo were charged with aggravated rape of a child under 16 by force, two counts of assault with intent to rape a child under 16, three counts of assault and

battery by means of a dangerous weapon, indecent assault and battery on a person who has

attained the age of 14, and three counts of witness intimidation. Id. ¶ 312. Galileo could have

faced up to a life sentence if convicted. Id. ¶ 313.

Days before his trial was to begin, however, the Commonwealth filed nolle prosequi

notices with respect to all charges against Galileo, effectively declining to continue with the

prosecution. Id. ¶ 314. Defendants represent that Gual and Roberto pleaded guilty to some of the

charges against them, although it is not clear whether this fact is part of the summary judgment

record. See [ECF No. 1 ¶¶ 109–10; ECF No. 97 at 2].

### N.    Procedural History of This Case

Plaintiffs commenced this case in October 2015, naming as Defendants the City of

Somerville, Curtatone, Pierantozzi, and Scarpelli. [ECF No. 1]. The Complaint contains five

causes of action: conspiracy to violate, and violation of, Galileo's constitutional rights (Count I);

violation of the Massachusetts Civil Rights Act (Count II); defamation (Count III); intentional

infliction of emotional distress (Count IV); and civil conspiracy (Count V). Id. at 21–24. The

Complaint asserts all five counts against the three individual Defendants and Count I (the

constitutional claim) against the City. Id. Following discovery, Defendants moved for summary

judgment on all counts. [ECF No. 96].

## II.    SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate if there is no genuine issue as to any material fact and

the undisputed facts show that the moving party is entitled to judgment as a matter of law."

Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010) (citing Fed. R. Civ. P.

56(c)(2)). "An issue is 'genuine' if the evidence of record permits a rational factfinder to resolve

it in favor of either party. A fact is 'material' if its existence or nonexistence has the potential to change the outcome of the suit." <u>Id.</u> at 4–5 (citation omitted).

Once the moving party has asserted the absence of evidence to support a material fact, the nonmoving party must offer "definite, competent evidence to rebut the motion." <u>Meuser v. Fed. Express Corp.</u>, 564 F.3d 507, 515 (1st Cir. 2009). "The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." <u>Mack v. Great Atl. & Pac. Tea Co.</u>, 871 F.2d 179, 181 (1st Cir. 1989). Thus, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." <u>Medina-Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990).

## III. ANALYSIS

Before examining each of Plaintiffs' claims in detail, it is important to clarify that this summary judgment motion does not hinge on a determination about who was involved in the incident or in precisely what capacity. Thus, the wide variation in eyewitness accounts provided in the record as to those factual issues does not foreclose summary judgment. Similarly, the motion does not require the Court to decide whether the camp was adequately supervised, or whether police and prosecutors were sufficiently diligent in their investigation and charging decisions.

Instead, the material facts for purposes of this motion concern the actions of the named Defendants as they first gathered information about the attack, reported that information to law enforcement, and subsequently communicated with players and parents. Specifically, Counts I,

II, IV, and V all turn on whether a fact-finder could reasonably conclude, based on this record, that Defendants conspired to (1) provide false information to police or prosecutors in order to instigate proceedings against Galileo, or (2) threaten, influence, or coerce witnesses to alter their statements in order to further the prosecution of Galileo. Count III, alleging defamation, stands on a slightly different footing, focusing on the nature and timing of the specific statements that Defendants are said to have made.

## A.     Count I: Conspiracy to Violate, and Violation of, Galileo's Constitutional Rights

Plaintiffs argue that Defendants conspired to violate Galileo's substantive and procedural due process rights. [ECF No. 105 at 15, 20]. With respect to substantive due process, Plaintiffs assert that Defendants "interfered with Galileo's fundamental right not to be framed for a crime he did not commit" when they "repeatedly tampered with witnesses, made false statements to law enforcement, and interfered with an ongoing criminal investigation."[5] Id. at 16. With respect to procedural due process, the core of Plaintiffs' theory is that Defendants, by their concerted actions, "manufactured" probable cause to arrest Galileo, which triggered his suspension from school and his eventual arrest. Id. at 20–21. Plaintiffs assert that the arrest resulted in Galileo's loss of liberty, that the suspension infringed on his property interest in a public school education, and that both damaged his reputation. Id.

A civil rights conspiracy is defined as

a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to 'inflict a wrong against or injury upon another,' and 'an overt act that results in damages.'

---

[5] Defendants' attempt to characterize this claim as one for malicious prosecution, see [ECF No. 97 at 26–28], is not faithful to Plaintiffs' theory and the Court does not consider it.

Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988) (citation omitted). Thus, in order for a conspiracy to be actionable under 42 U.S.C. § 1983, a plaintiff must show that there was both (1) an agreement and (2) "an actual deprivation of a right secured by the Constitution and laws." Id. Based on the record before the Court, Plaintiffs' claim fails on both prongs.

First, on this record, no reasonable fact-finder could conclude that the named Defendants formed an "agreement . . . 'to inflict a wrong against or injury upon'" Galileo. Id. (citation omitted). Although there is support for a jury to find that Defendants met and agreed on certain things—for instance, that they would convene at Foss Park to discuss the assault with the players, Pl. Facts ¶ 178, or about what to do and say at the meetings at Foss Park and the library, id. ¶ 196—the evidence does not indicate that any of those agreements had anything to do with implicating Galileo in particular, much less falsely implicating him. In short, nowhere do Plaintiffs identify facts that would permit a jury to conclude, even inferentially, that Defendants agreed to follow any specific course of conduct in relation to Galileo, including to inflict a constitutional harm upon him.

In the context of this case, to withstand summary judgment, Plaintiffs would need to identify facts from which a reasonable fact-finder could conclude that Defendants agreed to lie to the police about Galileo's involvement in the broomstick attack or to tamper with witnesses in a way that induced them to falsely implicate Galileo. Plaintiffs assert that support for such conclusions resides in paragraphs 268 to 270 and 337 to 345 of their statement of facts. See Pl. Facts ¶¶ 27, 32, 43. Having parsed these paragraphs and the rest of Plaintiffs' statement of facts in the light most favorable to Plaintiffs' claim, the Court finds little support for Plaintiffs' position beyond speculation.

Paragraphs 337 to 345 do not contain facts that would permit a rational fact-finder to

conclude that Defendants conspired to provide false information or influence witnesses. They mostly describe, in general terms, unremarkable contact between Defendants, the Somerville Police Department, and the Berkshire County District Attorney's Office during the investigation and prosecution of Galileo. They also describe efforts by school officials to assist the police and prosecutors by, for instance, arranging to make witnesses available for interviews. See Pl. Facts ¶ 340. The most notable paragraphs describe Pierantozzi omitting information from an affidavit filed in August 2014 and Defendants urging prosecutors to re-file charges against Galileo in the spring of 2014. Id. ¶¶ 344–45. Even if a jury credited these facts, they have no bearing on Defendants' conduct in August 2013, when the purported conspiracy occurred, and in fact, postdate the alleged conspiracy by several months to a year.

Paragraphs 268 to 270, which summarize an affidavit from Plaintiffs' proffered expert, a forensic developmental psychologist, also fail to satisfy Plaintiffs' burden at this stage. The essence of this expert's opinion is that "City officials and coaches" created an "atmosphere of accusation against Galileo" that encouraged freshman eyewitnesses to identify Galileo as a perpetrator in the attack. See Pl. Facts ¶¶ 268–70; [ECF No. 105-8, Ex. 92]. Even if a jury credited this opinion, Plaintiffs would still need to show that Defendants deliberately created this "atmosphere of accusation" as part of a conspiracy to frame Galileo. At a minimum, this would require a showing that Defendants understood and collectively pursued the sorts of subtle methods of eyewitness influence referred to in the expert's affidavit. See Ex. 92 ¶¶ 7, 10–11, 14–15 (discussing suggestive comments that may have compromised integrity of eyewitness accounts to police). Nothing in this record raises such an inference above the speculative level.

Plaintiffs' theory of imputed guilt is just that—a theory that, the summary judgment record reveals, arises not from evidence but from pure speculation. In the absence of any real or

even colorable evidence of a conspiracy, Plaintiffs fall back on the idea that "because this happened, Defendants must have conspired to make it happen." It is undisputed that Galileo was one of three upperclassmen present in the freshman cabin at the time of the incident, and that all three of those upperclassmen, including Galileo, were suspended from school and soccer pending a police investigation. It is also undisputed that Defendants conveyed some version of those basic facts to the police and the witnesses. These facts, even considered in the light most favorable to Plaintiffs' theories, do not adequately support the view that Defendants formed a plan to induce law enforcement and eyewitnesses to draw only negative inferences about Galileo and to therefore ensure his wrongful arrest in order to divert attention from their own acts and omissions. The leap from those facts to that conclusion relies wholly on speculation and conjecture. Although the Court must view the evidence in the light most favorable to Plaintiffs, "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment." Tobin v. Fed. Express Corp., 775 F.3d 448, 452 (1st Cir. 2014).

Second, Plaintiffs have failed to demonstrate an actionable constitutional injury. To find a constitutional harm under § 1983, the Court must first determine whether the official's conduct shocks the conscience. DePoutot v. Raffaelly, 424 F.3d 112, 118 & n.4 (1st Cir. 2005). If it does, the Court must next examine "what, if any, constitutional right may have been violated by the conscience-shocking conduct and identify the level of protection afforded to that right by the Due Process Clause." Id. at 118.

Based on this record, no reasonable fact-finder could determine that the named Defendants engaged in behavior that shocks the conscience. This is largely because Defendants were dealing with admittedly "jumbled" and inconsistent reports of what occurred in the cabin. See Pl. Facts. ¶ 169. As noted above, at least two freshmen initially reported what Gual had

done, and "someone" mentioned that Galileo and Roberto had been in the freshman cabin as well. Id. ¶¶ 138–39. Osoy-Arias later told police that "[t]he coaches got the impression that Galileo and Roberto 'were not helping but watching and not doing anything to stop it.'" Id. ¶ 139. Critically, in each of these initial accounts, Galileo's presence in the cabin at the time of the attack is undisputed, and does not shock the conscience that Defendants relayed that information to the police. (In fact, it would be measurably more shocking if Defendants had withheld it from authorities.) Nor does the fact that Defendants eventually followed Det. Costa-McDade's instruction to end their own inquiry into the assault and instead rely upon law enforcement to investigate the extent of each upperclassman's involvement shock the conscience. See Pl. Facts ¶¶ 187–88. Given the sensitive and "jumbled" facts of this case, the young age of everyone involved in the underlying incident, and the serious nature of the allegations, Defendants' choice to begin an investigation but to ultimately defer to law enforcement was, at a minimum, within the range of reasonableness, and therefore, by definition, not shocking to the conscience. See, e.g., Lockhart-Bembery v. Sauro, 498 F.3d 69, 78 (1st Cir. 2007) (holding that, because officer's actions were reasonable, plaintiff could not meet shock-the-conscience test).

Once the police had the information about who was present during the incident, Galileo became a suspect and, like Gual and Roberto, was suspended from school and the soccer team pending the outcome of the investigation. There is no evidence that anyone drew any prejudicial inferences from the fact of the suspension, but whatever inferences police, prosecutors, or eyewitnesses may have drawn are not reasonably attributable to these Defendants, and therefore do not make their behavior any more or less shocking to the conscience.

Moreover, Plaintiffs have not produced evidence of a colorable constitutional violation. "[T]here is no constitutional due process right to have child witnesses in a child sexual abuse

investigation interviewed in a particular manner, or to have the investigation carried out in a particular way." Devereaux v. Abbey, 263 F.3d 1070, 1075 (9th Cir. 2001). See also Garner v. Harrod, 656 F. App'x 755, 760–61 (6th Cir. 2016) ("[T]here is no constitutionally protected right to the manner in which a criminal investigation is conducted."). The main limitation on that principle, as relevant to this case, is that "those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit." Limone v. Condon, 372 F.3d 39, 44–45 (1st Cir. 2004). Even assuming that these Defendants— school and city officials who do not work for any law enforcement agency—could be held liable on such a theory,[6] there is no evidence that the named Defendants "deliberately fabricated evidence" or intentionally influenced witnesses in order to frame Galileo. At most, a reasonable jury could conclude that Defendants incidentally imputed guilt to Galileo when they referred collectively to the three upperclassmen who had been "involved" in the incident and identified Galileo as someone with whom the players should not have contact due to his connection to the investigation. Pl. Facts ¶¶ 204–05. But there are no facts from which a reasonable jury could conclude that Defendants intentionally created this impression in order to frame Galileo.[7]

Accordingly, summary judgment in Defendants' favor is appropriate with respect to Count I.

---

[6] Typically, cases alleging such a constitutional harm are premised on the conduct of law enforcement officials, e.g., Limone v. Condon, 372 F.3d 39, 43 (1st Cir. 2004) (FBI agent and Boston police officer); Zahrey v. Coffey, 221 F.3d 342, 344 (2d Cir. 2000) (prosecutor acting in investigative capacity), but some cases have extended the theory to potentially apply to other government actors, e.g., Devereaux v. Abbey, 263 F.3d 1070, 1073 (9th Cir. 2001) (employees of state department of social and health services).

[7] Similarly, Plaintiffs have failed to produce any evidence to support their theory of motive, which seems to be that Defendants maliciously intended to frame Galileo so they would have a public scapegoat for the incident. See [ECF No. 105 at 12]. The notion that Defendants harbored any "animus" toward Galileo finds no factual support in the paragraphs identified by Plaintiffs, see Pl. Facts ¶¶ 164, 301–05, 307–08, 315–20, or elsewhere in the summary judgment record.

### B.     Count II: Massachusetts Civil Rights Act

Plaintiffs next claim that Defendants conspired to violate Galileo's due process rights in

violation of the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, §§ 11H–I.

[ECF No. 105 at 23]. The MCRA requires a plaintiff to demonstrate that "(1) his exercise or

enjoyment of rights secured by the Constitution or laws of either the United States or the

Commonwealth, (2) has been interfered with, or attempted to be interfered with, and (3) that the

interference or attempted interference was by 'threats, intimidation or coercion.'" Meuser, 564

F.3d at 516 (quoting Bally v. Northeastern Univ., 532 N.E.2d 49, 51–52 (Mass. 1989)). The

MCRA, therefore, is narrower than § 1983 because the third element limits its scope to conduct

that involves "threats, intimidation or coercion." See Najas Realty, LLC v. Seekonk Water Dist.,

821 F.3d 134, 141 n.8 (1st Cir. 2016). Thus, where constitutional violations alleged under § 1983

fail, an MCRA claim predicated on those same alleged violations must also fail. See id.

Therefore, here, because Plaintiffs' due process claim does not survive summary

judgment, the MCRA count, which derives from that claim, also fails.[8]

### C.     Count III: Defamation

Four elements are required to establish a defamation claim under Massachusetts law:

(1) that '[t]he defendant made a statement, concerning the plaintiff, to a third party';
(2) that the statement was defamatory such that it 'could damage the plaintiff's

---

[8] Alternatively, Plaintiffs' claim fails because the record lacks evidence of any "threats, intimidation or coercion" by Defendants. For purposes of MCRA liability, a "threat . . . involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm," "'[i]ntimidation' involves putting in fear for the purpose of compelling and deterring conduct," and "coercion" means "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." Meuser, 564 F.3d at 516 (quoting Planned Parenthood League v. Blake, 631 N.E.2d 985, 990 (Mass. 1994)). Each of these elements requires proof that the culpable party acted with the purpose of influencing the actions of another. As discussed in Section III.A., supra, this record lacks evidence from which a rational fact-finder could conclude that any of the named Defendants acted with such a purpose.

reputation in the community'; (3) that '[t]he defendant was at fault in making the statement'; and (4) that '[t]he statement either caused the plaintiff economic loss . . . or is actionable without proof of economic loss.'

Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012) (quoting Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 510–11 (Mass. 2003)). Although "imputation of crime is defamatory per se," Stone v. Essex Cty. Newspapers, Inc., 330 N.E.2d 161, 165 (Mass. 1975), in certain situations, defamation liability will be precluded by an absolute privilege, see Correllas v. Viveiros, 572 N.E.2d 7, 10–11 (Mass. 1991). For instance, as relevant here, "statements made to police or prosecutors prior to trial are absolutely privileged if they are made in the context of a proposed judicial proceeding." Correllas, 572 N.E.2d at 11.

Plaintiffs identify three categories of allegedly defamatory statements made by Defendants regarding Galileo's involvement in the attack: (1) statements to soccer team members and their parents, see [ECF No. 105 at 26], (2) statements to law enforcement officers and prosecutors, see id. at 26 n.22, and (3) statements to the media at a press conference following the arrests on August 30, see id. at 27.

With regard to the first category, statements to team members and their parents, Plaintiffs do not identify any particular statement or statements, but rather refer generally to Defendants' "original false statements about Galileo's supposed involvement in the anal rape of a child [which] were made to over a hundred soccer players and their parents at Foss Park and at the Library Meeting." Id. at 26. To the extent this allegation is meant to encompass statements to the effect that Galileo was present in the cabin at the time of the assault, that his name was provided to law enforcement, or that he was suspended as a consequence of being a target of the investigation, the truth of such statements is undisputed by Plaintiffs. True statements, in this context, cannot support defamation liability. See Mass. Sch. of Law at Andover, Inc. v. Am. Bar

Ass'n, 142 F.3d 26, 42 (1st Cir. 1998) ("Truth is an absolute defense to a defamation action under Massachusetts law . . . .").[9] If Plaintiffs seek to rely on any other statements, they have failed to adequately identify such statements.

With regard to the second category of statements, Defendants' allegedly false statements to law enforcement and prosecutors, Plaintiffs claim that these statements "were designed to make it appear that witnesses had supposedly implicated Galileo in the rape, that Galileo had been present during the commission of a crime that was far more violent than the actual crime was (e.g., that the victim was forced onto his hands and knees)," that "Galileo had supposedly been expelled from two private schools," and "that Galileo and Roberto were sexually attracted to each other." [ECF No. 105 at 26 n.22] (citing Pl. Facts ¶¶ 236, 293, 294). Plaintiffs contend that such statements are not protected by any privilege because they were "unsubstantiated reports" made by non-witnesses before a criminal action or judicial proceeding was contemplated or proposed. Id.

This argument misconstrues the context in which the challenged statements arose. The particular statements identified in Plaintiffs' brief involve an undated statement by unspecified "school officials" to an assistant district attorney, Pl. Facts ¶ 236, as well as statements by Scarpelli to State Police on August 28 and 29, id. ¶¶ 293, 294. The undisputed facts show that the Somerville Police formally opened a criminal investigation into the assault on the evening of

---

[9] Massachusetts law recognizes a "narrow exception" to this defense: the truth or falsity of an allegedly defamatory statement is immaterial, and a libel action may proceed, if the plaintiff can show that the defendant acted with "actual malice" in publishing the statement. Noonan v. Staples, Inc., 556 F.3d 20, 26 (1st Cir. 2009) (citing Mass. Gen. Laws ch. 231, § 92). Plaintiffs do not assert that this exception applies here. Even if they did, and even assuming it could apply in a case, like this one, that sounds in slander rather than libel, the record contains no evidence from which a reasonable fact-finder could conclude that Defendants acted with "actual malice" in the sense of "ill will" or "malevolent intent." See Piccone v. Bartels, 40 F. Supp. 3d 198, 214 (D. Mass. 2014), aff'd, 785 F.3d 766 (1st Cir. 2015).

August 27 and, at that time, told Defendants that the three upperclassmen present in the cabin might be charged with "some form of aggravated rape[] or sexual assault." Id. ¶¶182, 184. Thus, by the time the identified statements were made, a formal criminal investigation had been opened and charges against all three upperclassmen, including Galileo, were being contemplated. Accordingly, here, as in Correllas, an absolute privilege applies "because police and prosecutors were contemplating a criminal action when the [Defendants] made the allegedly defamatory statements." Correllas, 572 N.E.2d at 13.[10]

Finally, Plaintiffs claim that Curtatone defamed Galileo when, on August 30, he told various media outlets, "These allegations go far beyond hazing. This is rape." [ECF No. 105 at 27]; Pl. Facts ¶ 318. Plaintiffs claim that these statements are defamatory because "[e]veryone who heard [them] knew" that Curtatone was referring to Galileo and effectively accusing him of rape. [ECF No. 105 at 27]. This argument distorts the statements in question and requires the drawing of inferences that are not warranted by the record. In context, it is clear that Curtatone was referencing the charges of aggravated rape that led to the arrests of Gual, Roberto, and Galileo, rather than attributing conduct to a particular individual. See [ECF No. 105-9, Ex. 116 at 90]. See also Pl. Facts ¶¶ 318, 320. The transcript of the press conference reflects that Curtatone and the other speakers were careful to describe the charges as "allegations" rather than proven facts, and that no particular student was identified by name. Id. More importantly, it is undisputed that Galileo had been arrested on rape-related charges. Pl. Facts ¶ 312. Because the

---

[10] The same reasoning applies with respect to Defendants' report to Det. Costa-McDade regarding Galileo's alleged involvement with the attack on A.D., although Plaintiffs do not discuss this statement in the defamation section of their brief. See Pl. Facts ¶ 233. Because that statement occurred after the opening of a criminal investigation, at a point in time when criminal charges were already being contemplated, it too is protected by an absolute privilege. See Correllas v. Viveiros, 572 N.E.2d 7, 10–11, 13 (Mass. 1991).

statement made by Curtatone was therefore true, it cannot give rise to defamation liability. See Mass. Sch. of Law, 142 F.3d at 42 (truth is absolute defense to defamation action). See also Thompson v. Globe Newspaper Co., 181 N.E. 249, 253 (Mass. 1932) (endorsing rule that "publication of the fact that one has been arrested, and upon what accusation, is not actionable, if true").

Accordingly, the Court allows Defendants' motion for summary judgment on Count III.

### D.      Count IV: Intentional Infliction of Emotional Distress

Plaintiffs next claim that Defendants are liable for intentional infliction of emotional distress because, when they "framed an innocent boy for sex crimes that they knew, or should have known, he did not commit, and then publicly vilified him, they either intended to cause, or were recklessly indifferent to the fact that they would cause, severe emotional distress to the boy and his parents." [ECF No. 105 at 28].

To make out a claim of intentional infliction of emotional distress, Plaintiffs must show (1) that Defendants "intended, knew, or should have known that [their] conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." Galvin v. U.S. Bank, N.A., 852 F.3d 146, 161 (1st Cir. 2017) (citing Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014)). The standard for "extreme and outrageous" conduct is "very high," requiring behavior that "go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." Id. (alterations in original).

Had Plaintiffs produced evidence from which a rational juror could conclude that Defendants framed Galileo, deliberately lied to law enforcement, or intentionally influenced witnesses to do so, this claim could have survived summary judgment. See, e.g., Limone, 579

F.3d at 94–95 (affirming trial court's finding of extreme and outrageous conduct based on FBI agents having knowingly participated in events leading to wrongful indictment, prosecution, conviction, and continued incarceration of scapegoated individuals); Merisier v. Ellender, 197 F. Supp. 3d 310, 322 (D. Mass. 2016) (finding disputed factual issue precluded summary judgment on intentional infliction of emotional distress claim where jury could conclude that officers "forced their way into the plaintiffs' home, without cause, in the middle of the night, caused a ruckus to wake the family and humiliate [the plaintiff], and then wrongfully, and without cause, handcuffed him and threatened him"). As discussed in Section III.A., supra, however, the record in this case is insufficient to support such findings, and it does not otherwise depict behavior that "shocks the conscience." For essentially the same reasons that Defendants' conduct could not be found to shock the conscience, no rational juror could conclude that Defendants' conduct was "extreme and outrageous" in the sense required to sustain a claim for intentional infliction of emotional distress.

As a result, the Court grants summary judgment for Defendants on Count IV.

### E.    Count V: Civil Conspiracy

"Massachusetts recognizes two types of civil conspiracy, so-called 'true conspiracy' and conspiracy based on section 876 of the Restatement (Second) of Torts." Taylor v. Am. Chemistry Council, 576 F.3d 16, 34 (1st Cir. 2009). The first is "drawn from the common law, [and] amounts to 'a very limited cause of action' . . . based on the defendants' allegedly unique ability to exert a 'peculiar power of coercion' when acting in unison." Snyder v. Collura, 812 F.3d 46, 52 (1st Cir.), cert. denied, 136 S. Ct. 2517 (2016) (citation omitted). Thus, the "wrong" suffered by the plaintiff arises from "the particular combination of the defendants rather than in the tortious nature of the underlying conduct"—for example, collusive behavior among market

competitors. Id. "The second type of conspiracy, based on section 876 of the Restatement, is a form of vicarious liability for the tortious conduct of others." Taylor, 576 F.3d at 34. "The conspiracy consists in agreeing to, or assisting in, [an] underlying tort." Id. at 35. Within this second type of conspiracy, Massachusetts courts have recognized two theories of liability: (1) concerted action, and (2) substantial assistance, or aiding and abetting. Id.

Plaintiffs allege both types of civil conspiracy here. [ECF No. 105 at 29–30]. With respect to the first, they claim that Defendants used their positions within the school district and the city government "to exert a peculiar power of coercion" over the soccer players and the criminal investigation, and that they would have been unable to wield such influence had they acted alone. Id. at 30. As already discussed, this record is too thin and reliant on speculation to permit a rational fact-finder to conclude that Defendants engaged in any sort of coercive conspiracy to frame Galileo or influence witnesses against him. See Section III.A., supra. Accordingly, this first theory of civil conspiracy fails.

With respect to the second theory, case law makes clear that such liability requires the existence of an underlying tort. See Taylor, 576 F.3d at 34–35. Because, as more fully set forth above, none of Plaintiffs' independent tort theories survives summary judgment, see Sections III.C.–D., supra, Plaintiffs' alternative civil conspiracy claim also cannot succeed. Defendants' motion for summary judgment is therefore granted on Count V.

F.      Request for Costs and Attorney's Fees

Defendants also ask the Court to order reimbursement for their costs and attorney's fees pursuant to 42 U.S.C. § 1988(b) because Plaintiffs filed a "baseless" complaint. [ECF No. 97 at 3]. Rather than explain why they believe such an order is appropriate, Defendants state that they plan to file a separate motion for sanctions under Fed. R. Civ. P. 11(c). Id. at 3 n.2.

The Court is wary of undertaking a § 1988 analysis without the benefit of any specific argument from the parties. Nevertheless, at this point, it does not appear to the Court that Plaintiffs' complaint was so "frivolous, unreasonable, or without foundation" that it merits the assessment of costs and fees against them. See Rossello-Gonzalez v. Acevedo-Vila, 483 F.3d 1, 6 (1st Cir. 2007). A defendant does not prevail under § 1988 merely because discovery fails to produce evidence to substantiate a plaintiff's claims when the plaintiff reasonably could have expected to obtain such evidence. See Tang v. State of R.I., Dep't of Elderly Affairs, 163 F.3d 7, 13 (1st Cir. 1998) (noting that court "must assess the claim at the time the complaint was filed, and must avoid the post-hoc reasoning that, because the plaintiff did not ultimately prevail, the claim must have been frivolous, unreasonable or without foundation"). Accordingly, Defendants' request is DENIED without prejudice to filing a Rule 11 motion with a more detailed memorandum in support.

## IV.    CONCLUSION

For the reasons discussed, Defendants' motion for summary judgment [ECF No. 96] is GRANTED, and their request for costs and fees is DENIED without prejudice.

**SO ORDERED.**

October 26, 2017                                    /s/ Allison D. Burroughs
                                                    ALLISON D. BURROUGHS
                                                    U.S. DISTRICT JUDGE